UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| LEAH JUNG, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GARZA FOOD VENTURES, LLC d/b/a SIETE FAMILY FOODS,<br><br>Defendants. | CASE NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Leah Jung ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Defendant Garza Food Ventures, LLC d/b/a Siete Family Foods ("Siete" or "Defendant"), and alleges as follows. Plaintiff's allegations are based upon personal knowledge as to herself and her own acts, and upon information and belief and the investigation of her counsel as to all other matters.

## NATURE OF THE ACTION

1. Siete built a national snack brand on a single promise about a single ingredient: that its chips are fried in avocado oil, and in nothing else. That promise is printed on the front of every bag. It is repeated, without qualification, in the ingredient statement on the back, which declares avocado oil as the only oil in the product. It is repeated again on Siete's website, where the company tells consumers flatly that "[o]ur tortilla chips, maiz totopos and potato chips are fried in avocado oil."[1] Consumers pay a premium for that promise.

---

[1] https://sietefoods.com/faque/collections/ingredients/ (last visited on 08/20/2026)

2. The promise is false. In July 2026, food scientists at the University of California, Davis published the first systematic peer-reviewed study of whether the avocado oil and olive oil declared as ingredients in commercially processed foods is authentic (the "UC Davis Study" or "Study") (attached as Exhibit A). Citations in this Complaint to "Study at __" are to the pagination of the published article; citations to "Study, Table S__" are to those supplementary tables, which are available in a spreadsheet in the online version of the article.[2]

3. The researchers extracted the oil from 74 samples of 37 commercial products—each product sampled in two separate production lots—and measured the recovered oil's fatty acid and sterol profile against the internationally recognized compositional standards for authentic avocado oil codified in the *Codex Alimentarius*. Two Siete products were among those tested: Siete Kettle Cooked Sea Salt Potato Chips and Siete Maíz Sea Salt Corn Tortilla Chips (together, the "Products"). The Study, its published supplementary data, and the specific measurements for the Products are set out, and cited in full, in Section D below.

4. Neither Product passed. Every lot of every Siete Product the researchers tested yielded oil that was not compositionally consistent with authentic avocado oil. Instead, the recovered oil bore the compositional signature of cheap refined vegetable (seed) oils—the very oils that consumers pay a premium to avoid. Study, Tables S3–S4 (Sample Nos. 13–16); *id.* § 3.2, at 4.

5. The numbers are not close. Authentic avocado oil contains between 4.0% and 17.1% palmitoleic acid; the oil recovered from the Products contained 0.6% to 1.5%. Authentic avocado oil contains no more than 1.3% stearic acid; the Products contained 2.5% to 3.1%. Authentic avocado oil contains between 79.0% and 93.4% β-sitosterol; the Products contained

[2] https://www.sciencedirect.com/science/article/pii/S2772502226007274?via%3Dihub#sec0027 (last visited on 08/20/2026)

63.6% to 66.2%. And cis-vaccenic acid—the fatty acid the researchers identified as the single most discriminating marker of avocado oil authenticity—measured 4.1% in the oil recovered from laboratory chips actually fried in pure avocado oil, and 1.2% to 1.9% in Siete's. Study, Tables S3–S4 (Sample Nos. 13–16); *id.* Table 2, at 7.

6. The Products were not outliers. Of the twenty-eight avocado oil–labeled chip samples the UC Davis researchers analyzed, twenty-six—ninety-three percent—were classified as inconsistent with authentic avocado oil. Not a single one of the fourteen avocado oil–labeled chip products tested passed in both of its lots. Across all avocado oil–labeled products in the study, "[e]ighty-nine percent … exhibited compositional patterns inconsistent with authentic avocado oil." Study, Abstract, at 1; *id.* § 3.1, at 3–4; *id.* Table 1, at 4.

7. The researchers anticipated and experimentally refuted the obvious defense—that frying might alter the oil's chemical fingerprint. Using laboratory-prepared model potato chips and tortilla chips fried in reference avocado oil that fell within every applicable Codex range, they found that frying moved the major fatty acid markers by less than 0.6 percentage points, and moved cis-vaccenic acid—the key discriminatory marker for avocado oil authenticity—by only 0.1 percentage point. Study § 2.5.1, at 3; *id.* § 3.4, at 7–8; *id.* Table 2, at 7. Frying does not explain what the researchers found in Siete's chips. Substitution and dilution do.

8. What Siete sold, then, was economically adulterated food. A consumer who paid a premium for avocado oil chips received chips fried in something else, or in avocado oil cut with something else. Under Florida law, food is adulterated if "any substance has been substituted wholly or in part" for a declared ingredient, and misbranded if "its labeling is false or misleading in any particular." Fla. Stat. §§ 500.10, 500.11. Selling such food in Florida is unlawful. Fla. Stat. § 500.04.

9. Plaintiff Leah Jung is one of those consumers. She is a Jacksonville resident who bought the Products repeatedly, chose them over cheaper conventional chips, and paid more for them, precisely because the packages said they were made with avocado oil. Had she known that the oil in the Products was not avocado oil—or was not *only* avocado oil—she would not have bought them, or would not have paid the premium she paid.

10. Plaintiff brings this action individually, on behalf of a nationwide class, and on behalf of a Florida subclass of purchasers of the Products. On behalf of the Florida Subclass, Plaintiff asserts a claim under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* On behalf of the Nationwide Class, and in the alternative on behalf of the Florida Subclass, Plaintiff asserts a claim for unjust enrichment. She seeks damages, restitution, and an injunction requiring Siete either to stop making the avocado oil claim or to make it true.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, because this is a class action in which the proposed classes comprise more than 100 members, the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, and at least one member of the proposed classes is a citizen of a state different from Defendant. Plaintiff is a citizen of Florida. Defendant is a citizen of Texas.

12. This Court has personal jurisdiction over Defendant. Defendant is registered to transact business in Florida as a foreign limited liability company (Florida Division of Corporations Document No. M19000007649) and has maintained that registration continuously since August 8, 2019. Defendant has purposefully availed itself of the Florida market by manufacturing, marketing, distributing, and selling the Products to Florida consumers through

Florida retailers and through direct online sales into Florida, including the sales to Plaintiff in Duval County that give rise to this action. Defendant's own website directs Florida consumers to Florida retailers that carry their chips. Defendant has designated a registered agent for service of process in Florida: C T Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred here: Plaintiff saw the challenged labeling, purchased the Products, and suffered her economic injury in Duval County, Florida. Duval County lies within the Middle District of Florida, 28 U.S.C. § 89(b), and within its Jacksonville Division, M.D. Fla. Local Rule 1.04(a). This action is most directly connected to, and most conveniently advanced in, the Jacksonville Division. M.D. Fla. Local Rule 1.04(b).

## PARTIES

### A. Plaintiff

14. Plaintiff Leah Jung is a natural person, a citizen of the United States, and a citizen and resident of the State of Florida. She is domiciled in Jacksonville, Florida.

15. During the class period, Plaintiff purchased Siete Kettle Cooked Sea Salt Potato Chips and Siete Maíz Sea Salt Corn Tortilla Chips on numerous occasions in Duval County, Florida. She purchased the Products regularly and as recently as May of 2026.

16. Plaintiff purchased the Products specifically because they were represented as being made with avocado oil. Based on those representations, Plaintiff understood and reasonably believed that the oil used to make the Products was avocado oil, and that the Products were not made with any other oil.

17. Plaintiff selected the Products over less expensive conventional chips made with seed oils, and was willing to pay—and did pay—a price premium for them. The avocado oil representation was material to her purchasing decision; she took it into account each time she bought a Product, and she would not have purchased the Products, or would not have paid the price she paid, had she known that the oil in the Products was not avocado oil or was blended with cheaper oils.

18. Plaintiff therefore suffered injury in fact and lost money as a direct result of Defendant's conduct. She did not receive the benefit of her bargain, and she paid a price premium attributable to a representation that was not true.

**B. Defendant**

19. Defendant Garza Food Ventures, LLC is a Texas limited liability company, with its principal place of business in Austin, Texas. Defendant does business under the trade names "Siete Family Foods" and "Siete Foods," and is the owner of record of the SIETE trademark (U.S. Reg. No. 6,634,732). Defendant is the manufacturer, marketer, and distributor of the Products, and is responsible for the content of their labels, packaging, and advertising.

20. Defendant is a wholly owned subsidiary of PepsiCo, Inc., which acquired it on January 17, 2025. Defendant remains an active, separately existing legal entity, and PepsiCo, Inc. is identified in Defendant's Florida corporate filings as its member.

21. For purposes of 28 U.S.C. § 1332(d)(10), Defendant is a citizen of Texas, the state under whose laws it is organized and in which it maintains its principal place of business.

22. Defendant sells the Products throughout the United States, including in Florida, through national and regional grocery retailers, club stores, mass merchants, online marketplaces, and its own direct-to-consumer website.

## FACTUAL ALLEGATIONS

### A. Siete Sells Snacks on the Strength of a Single Ingredient Claim

23. Siete is a Mexican-American snack brand founded in Austin, Texas. It markets itself as a family business making "heritage-inspired foods" from "thoughtfully selected ingredients" and "real ingredients." Its products are sold in tens of thousands of retail locations nationwide.

24. Central to Siete's brand identity, and to the price its products command, is the representation that its chips are fried in avocado oil rather than in the refined seed oils used in conventional snack foods. Siete makes that representation on the front of the package, in the ingredient statement, on its product pages, in its category pages, in its consumer-facing FAQ, and in its editorial content.

25. On Siete's consumer FAQ page, under the question "How are your chips cooked?", Siete answers without qualification: "Our tortilla chips, maiz totopos and potato chips are fried in avocado oil."[3]

26. On the category page for its kettle cooked potato chips, Siete tells consumers: "All of our Kettle Cooked Potato Chips are made with avocado oil, and they are non GMO, and gluten free!"[4]

27. Siete knows how to disclose a different oil when it uses one. Its Grain Free Mexican Wedding Cookies declare "Coconut Oil" in the ingredient statement alongside avocado oil.[5] Its Maíz tortillas are marketed as deriving their "soft, pliable" texture from "savory sea salt and a

---

[3] https://sietefoods.com/faque/collections/ingredients/ (last visited on 08/20/2026)
[4] https://sietefoods.com/shop/chips-and-snacks/kettle-cooked-potato-chips/ (last visited on 08/20/2026)
[5] https://sietefoods.com/shop/sweets/cookies/mexican-wedding-cookies/?size=4.5oz (last visited on 08/20/2026)

touch of organic olive oil."[6] When Siete uses an oil other than avocado oil, it says so by name. As to the Products, it says only "avocado oil."

**B. The Avocado Oil Representation Appears Uniformly on Every Package of Each Product**

28. The Products are Siete Kettle Cooked Sea Salt Potato Chips and Siete Maíz Sea Salt Corn Tortilla Chips.







29. The front of every package of each Product bears a prominent avocado oil claim (the "Avocado Oil Representation"). The claim is not fine print and is not peripheral; it is a headline feature of the package design, displayed with the product name. The UC Davis researchers recorded the front-of-package label of each Product, verbatim, as "Made with Avocado Oil." Study, Table S1 (Sample Nos. 13–16) (col. "Front of package label"). The product listing UC Davis published with the Study likewise records the Products' names as "Siete Kettle Cooked Sea Salt Potato Chips Made with Avocado Oil" and "Siete Maiz Sea Salt Corn Tortilla Chips Made

---

[6] https://sietefoods.com/shop/tortillas-and-taco-shells/gluten-free-tortillas/gluten-free-maiz-organic-corn-tortillas/?size=9.7oz (last visited on 09/20/2026)

with Avocado Oil." UC Davis, *Brand information in Authenticity of avocado and olive oils used as ingredients in commercially processed foods* (July 2026) (the "UC Davis Media Kit") (Sample Nos. 13–16).

30. The Avocado Oil Representation is reinforced, not qualified, by the ingredient statement on the back of each package.

31. The complete ingredient statement for Siete Kettle Cooked Sea Salt Potato Chips reads, in its entirety: "Potatoes, Avocado Oil, Sea Salt."[7] Three ingredients. One oil. The Study records the Product's ingredients other than the declared oil as "potatoes, sea salt." Study, Table S1 (Sample Nos. 13–14).

32. The complete ingredient statement for Siete Maíz Sea Salt Corn Tortilla Chips reads, in its entirety: "Nixtamalized corn blend (organic white corn, organic yellow corn, lime), avocado oil, sea salt. May contain coconut."[8] Again, one oil. The Study records the Product's ingredients other than the declared oil as "nixtamalized corn blend (organic white corn, organic yellow corn, lime), sea salt. (may contain coconut)." Study, Table S1 (Sample Nos. 15–16).

33. Neither Product declares any oil other than avocado oil. Neither declares an oil blend. Neither uses an "and/or" oil statement of the kind conventional snack manufacturers use when the frying oil may vary. The three vegetable oil chip products the UC Davis researchers collected as compositional comparators declared their oils in exactly that manner—for example, "Vegetable Oil (corn, canola, soybean, and/or sunflower oil)" and "Vegetable Oil (canola, sunflower, safflower, and/or soybean)." Study, Table S1 (Sample Nos. 75–77). Neither Product carries a "may contain" qualifier as to oils; the only advisory of that kind on either Product is an

[7] https://sietefoods.com/shop/chips-and-snacks/kettle-cooked-potato-chips/sea-salt-potato-chips-6-bags/?size=5.5oz (last visited on 08/20/2026)

[8] https://sietefoods.com/shop/chips-and-snacks/maiz-chips/maiz-sea-salt-totopos-corn-tortilla-chips-7-5oz/?size=7.5oz (last visited on 08/20/2026)

allergen cross-contact advisory as to coconut on the Maíz Product, which neither qualifies the declared oil nor discloses the presence of any additional oil. *Id.* (Sample Nos. 15–16). Nowhere on the package, and nowhere else, does Siete disclose that the oil in the Products is or may be blended, diluted, or substituted with cheaper vegetable or seed oils.

34. Siete's own marketing copy underscores the point. Of the Kettle Cooked Sea Salt Potato Chips, Siete tells consumers it "made a simple potato chip with just the basics—avocado oil and sea salt."[9] Of the Maíz Sea Salt Corn Tortilla Chips, Siete tells consumers it "put all three of these ingredients together—organic white and yellow corn, avocado oil, and sea salt."[10]

35. A reasonable consumer who reads an avocado oil claim on the front of a bag of chips, and then finds "avocado oil"—and only "avocado oil"—in a three-ingredient statement on the back, understands that the oil in the chips is avocado oil. That is the only reasonable reading. It is the reading Siete intended.

### C. The Avocado Oil Representation Is Material and Commands a Price Premium

36. The Avocado Oil Representation is material. It is important to reasonable consumers in deciding whether to buy the Products and how much to pay for them. As the UC Davis researchers observed, "consumers may reasonably interpret front-of-package oil claims as signals of meaningful product differentiation," and published research "demonstrates that ingredient-based claims and 'free-from' labels can generate halo effects, shaping perceptions of healthiness and sustainability beyond what is objectively warranted." Study § 1, at 2.

[9] https://sietefoods.com/shop/chips-and-snacks/kettle-cooked-potato-chips/sea-salt-potato-chips-6-bags/?size=5.5oz (last visited on 08/20/2026)
[10] https://sietefoods.com/shop/chips-and-snacks/maiz-chips/maiz-sea-salt-totopos-corn-tortilla-chips-7-5oz/?size=7.5oz (last visited on 08/20/2026)

37. Avocado oil is widely regarded as among the healthiest culinary oils. It is high in monounsaturated fat, which is considered more heart-healthy than saturated fat and more stable than the polyunsaturated fats that predominate in common seed oils. *See* Study § 1, at 1 (avocado oil and olive oil "are rich in monounsaturated fatty acids, particularly oleic acid, and are valued for their nutritional properties"). It has one of the highest smoke points of any plant-based food oil, making it desirable for high-heat applications such as frying. Consumers seeking to reduce their consumption of refined seed oils—a large and growing segment of the snack-buying public—specifically seek out products made with avocado oil. *Id.* (the use of these oils in processed foods "is often motivated by consumer interest in perceived nutritional benefits and marketing strategies that differentiate products from those formulated primarily with seed oils").

38. Consumers pay real money for that preference. The UC Davis researchers documented that "[r]etail prices showed consistent premiums for products labeled as containing avocado oil or olive oil relative to vegetable oil counterparts." Study § 3.1, at 4. Chips labeled with avocado oil ranged from $0.30 to $2.00 per ounce, compared with $0.44 to $0.62 per ounce for vegetable oil chips. *Id.*; *id.* Table 1, at 4.

39. The Products were priced at that premium. The Study records a retail price of $4.99 for a 5.5-ounce bag of Siete Kettle Cooked Sea Salt Potato Chips—$0.91 per ounce—and $6.99 for a 7.5-ounce bag of Siete Maíz Sea Salt Corn Tortilla Chips—$0.93 per ounce. Study, Table S1 (Sample Nos. 13–16). The three vegetable oil chip products the researchers collected as compositional comparators were priced at $0.45, $0.44, and $0.62 per ounce. *Id.* (Sample Nos. 75–77). The Products were therefore priced at roughly one and a half to two times the price of comparable chips fried in the very vegetable oils that the Products in fact contain. The nearest comparator to the Maíz Product—a tortilla chip made of nothing but corn and salt, fried in

"Vegetable Oil (corn, canola, soybean, and/or sunflower oil)"—sold for $0.45 per ounce, less than half the Maíz Product's $0.93. *Id.* (Sample No. 75).

40. Siete charged more than the chips that were what they said they were. The only two avocado oil–labeled chip samples in the entire Study classified as compositionally consistent with authentic avocado oil were priced at $0.63 and $0.83 per ounce—both less than either Product. Study § 3.1, at 4. As the researchers concluded, "retail price alone was not a reliable indicator of ingredient authenticity and consumers cannot rely on price alone as an indicator of authenticity." *Id.*

41. The UC Davis researchers expressly recognized the signaling function of these claims: because every product they studied "declared only a single edible oil in the ingredient statement and did not disclose blended oil formulations," "consumers would reasonably expect the named oil, particularly when emphasized through front-of-package claims such as 'made with 100% avocado oil' to be the primary lipid source of the product." Study § 3.1, at 4. The Study's lead author put it more directly: "If consumers are buying potato chips that say they're made with 100% avocado oil, that should be the product that they're getting." Amy Quinton, *That Avocado Oil Chip You're Eating May Not Be Made With Pure Avocado Oil*, UC Davis (July 15, 2026), https://www.ucdavis.edu/food/news/avocado-oil-chip-youre-eating-may-not-be-made-pure-avocado-oil (the "UC Davis News Release").

42. Materiality here does not depend on whether avocado oil is in fact superior to other oils. Whether the oil in a food is the oil the label says it is, rather than a cheaper oil substituted for it, is material to any reasonable consumer. Consumers may be allergic to particular oils, may avoid particular oils for religious, dietary, or medical reasons, or may simply wish to know what they are eating. Purchasers of the Products reasonably expect to be told, truthfully, what oil is in them.

43. Siete itself has proved the point. By putting the avocado oil claim in the Products' own presentation on the front of the package and by charging accordingly, Siete has demonstrated that it regards the identity of the frying oil as material to consumers.

**D. The UC Davis Study Establishes That the Oil in the Products Is Not Avocado Oil**

44. In July 2026, the peer-reviewed journal *Applied Food Research* published the UC Davis Study. Natalie Lopez-Alvarez, Xueqi Li, Benjamin Vizgordiski & Selina C. Wang, *Authenticity of avocado and olive oils used as ingredients in commercially processed foods*, 6 *Applied Food Research* 102389 (2026), https://doi.org/10.1016/j.afres.2026.102389. The article was accepted July 10, 2026 and made available online July 11, 2026. Study at 1. It was published with five supplementary data tables: Table S1 (product category, declared oil, front-of-package label, other ingredients, package size, retail price, and collection location for every sample); Table S2 (the brands tested); Table S3 (the complete fatty acid profile of every sample); Table S4 (the complete sterol profile of every sample); and Table S5 (the profiles of the laboratory model products). *Id.* at 9 (Supplement contents). The Study is the first "to systematically evaluate the authenticity of avocado oil and olive oil used as the sole declared edible oil ingredients in commercially processed foods." *Id.* § 1, at 2.

45. The researchers selected commercially processed foods in three categories—chips, mayonnaise, and salad dressings—"based on consumer popularity and market availability." Study § 2.1, at 2. Critically, they included "[o]nly products that declared a single oil (e.g. avocado oil or olive oil) in the ingredient statement and did not list additional edible oils." *Id.* Both Products satisfied that criterion and were included. *Id.* Table S1 (Sample Nos. 13–16).

46. The researchers analyzed 74 samples representing 37 distinct commercial products. "Two separate lots of each product were collected and analyzed, and each lot was analyzed in

duplicate." Study § 2.1, at 2. Samples were purchased in 2025 and 2026 from online sources and from retail stores in California, and were stored unopened in the laboratory until analysis. *Id.* Lot numbers were recorded and are available from the corresponding author upon request. *Id.* The researchers separately collected three vegetable oil chip products and three vegetable oil mayonnaise products as compositional comparators, which were not included in the authenticity classification. *Id.*

47. In the product information published with the Study, Siete Kettle Cooked Sea Salt Potato Chips is identified as Sample Nos. 13 and 14, and Siete Maíz Sea Salt Corn Tortilla Chips is identified as Sample Nos. 15 and 16. Study, Table S1; UC Davis Media Kit (Sample Nos. 13–16). Each Product was therefore subjected to analysis drawn from two independent production lots, each lot analyzed in duplicate. Study § 2.1, at 2.

48. For each sample, the researchers extracted the lipid fraction from the food itself—blending approximately 30 grams of chips in a food processor, then performing Soxhlet extraction of approximately 10 grams of the crushed chips for 25 cycles using n-hexane at 69°C—and then measured the recovered oil's complete fatty acid profile and complete sterol profile by gas chromatography with flame ionization detection, in each case identified against authentic reference standards. Study §§ 2.2, 2.3.1, 2.3.2, at 2–3.

49. The researchers classified each sample by comparing its measured fatty acid and sterol profiles against the Codex Alimentarius *Standard for Named Vegetable Oils* (CXS 210-1999) and the *Standard for Olive Oils and Olive Pomace Oils* (CXS 33-1981), which are "intended to encompass expected natural variability" in the composition of authentic oils. Study § 2.4, at 3.

50. The Study's classification criteria were deliberately conservative and generous to the products tested. "To account for analytical uncertainty, biological variability, and potential

processing influences, minor deviations were tolerated in the classification criteria." Study § 2.4, at 3. Specifically:

(a) a deviation limited to a single fatty acid or sterol marker, "not exceeding 10% beyond established compositional limits," was "not considered sufficient to classify a sample as inconsistent" and such samples "were therefore considered consistent";

(b) a sample was treated as merely "borderline"—not inconsistent—where "no more than two fatty acid or sterol markers marginally exceeded the 10% allowance and lacked concordant deviations across other markers";

(c) "[w]hen a sample was fully consistent in either fatty acids or sterols and borderline in the other, it was considered consistent with authentic oil"; and

(d) only samples with "multiple deviations or patterns inconsistent with authentic reference profiles were classified as inconsistent." *Id.*

51. As the lead researcher explained: "we gave the samples some wiggle room, giving them a 10% margin of deviation to account for [natural variation], but 89% of the avocado products still failed." UC Davis News Release.

52. The Products failed. Both lots of Siete Kettle Cooked Sea Salt Potato Chips (Sample Nos. 13 and 14) and both lots of Siete Maíz Sea Salt Corn Tortilla Chips (Sample Nos. 15 and 16) yielded recovered oil whose fatty acid and sterol profiles deviated from the Codex compositional ranges for authentic avocado oil on numerous markers at once, and each was classified as not compositionally consistent with authentic avocado oil. Study, Tables S3–S4 (Sample Nos. 13–16); *id.* § 3.1, at 3–4; UC Davis Media Kit (Sample Nos. 13–16). Of the twenty-eight avocado oil–labeled chip samples analyzed, only two were classified as consistent with authentic avocado oil, and neither was a Siete sample. Study § 3.1, at 3–4; *id.* Table 1, at 4; *id.*

Tables S3–S4; UC Davis Media Kit (Sample Nos. 13–16). All four Siete samples failed, under criteria expressly designed to give the benefit of every doubt to the manufacturer.

53. The published per-sample data show how far outside the authentic range the Products fell. For Siete Kettle Cooked Sea Salt Potato Chips, the oil recovered from Sample No. 13 and the oil recovered from Sample No. 14 measured, respectively:

(a) palmitic acid (C16:0) of 9.1% and 8.5%, against a Codex range of 11.0–26.0%;

(b) palmitoleic acid (C16:1) of 1.4% and 1.5%, against a Codex range of 4.0–17.1%—roughly one-third of the minimum level found in authentic avocado oil;

(c) stearic acid (C18:0) of 2.5% and 2.6%, against a Codex range of 0.1–1.3%—roughly double the maximum;

(d) behenic acid (C22:0) of 0.6% in each lot, against a Codex range of ND–0.5%;

(e) campesterol of 11.4% and 8.6%, against a Codex range of 4.0–8.3%;

(f) stigmasterol of 5.3% in each lot, against a Codex range of 0.3–2.0%—more than two and a half times the maximum;

(g) clerosterol of 0.4% and 0.5%, against a Codex range of 1.0–2.5%;

(h) β-sitosterol of 65.2% in each lot, against a Codex range of 79.0–93.4%;

(i) Δ7-stigmastenol of 4.9% and 7.3%, against a Codex range of ND–1.5%—more than three times and nearly five times the maximum; and

(j) Δ7-avenasterol of 2.5% and 3.0%, against a Codex range of ND–1.5%. Study, Tables S3–S4 (Sample Nos. 13–14).

54. Lot 13 additionally measured brassicasterol at 1.2%, against a Codex range of ND–0.5%. Study, Table S4. Brassicasterol is not characteristic of avocado oil; it is "a characteristic sterol marker of canola oil." *Id.* § 3.3.1, at 6. Lot 14 additionally measured α-linolenic acid (C18:3)

at 0.4%, against a Codex range of 0.5–2.1%, and oleic acid (C18:1) at 75.1%, against a Codex range of 42.0–75.0%. *Id.* Table S3.

55. For Siete Maíz Sea Salt Corn Tortilla Chips, the deviations were larger still. The oil recovered from Sample No. 15 and the oil recovered from Sample No. 16 measured, respectively:

(a) palmitic acid (C16:0) of 9.4% and 8.6%, against a Codex range of 11.0–26.0%;

(b) palmitoleic acid (C16:1) of 0.6% and 0.7%, against a Codex range of 4.0–17.1%—less than one-fifth of the minimum level found in authentic avocado oil;

(c) stearic acid (C18:0) of 2.8% and 3.1%, against a Codex range of 0.1–1.3%—more than twice the maximum;

(d) linoleic acid (C18:2) of 31.8% and 29.1%, against a Codex range of 7.8–19.0%—more than half again the maximum. Linoleic acid is the dominant fatty acid of the refined seed oils, including soybean, corn, and sunflower oil;

(e) α-linolenic acid (C18:3) of 0.4% and 0.3%, against a Codex range of 0.5–2.1%;

(f) behenic acid (C22:0) of 0.6% and 0.7%, against a Codex range of ND–0.5%;

(g) campesterol of 11.8% and 12.6%, against a Codex range of 4.0–8.3%;

(h) stigmasterol of 6.0% and 6.6%, against a Codex range of 0.3–2.0%—three times the maximum;

(i) clerosterol of 0.6% in each lot, against a Codex range of 1.0–2.5%;

(j) β-sitosterol of 63.6% and 66.2%, against a Codex range of 79.0–93.4%;

(k) Δ5-avenasterol of 1.4% and 1.9%, against a Codex range of 2.0–8.0%;

(l) Δ7-stigmastenol of 3.6% and 4.5%, against a Codex range of ND–1.5%; and

(m) Δ7-avenasterol of 2.1% and 2.4%, against a Codex range of ND–1.5%. Study, Tables S3–S4 (Sample Nos. 15–16).

56. Each of the four Siete samples therefore fell outside the Codex compositional range for authentic avocado oil on at least eleven independent markers, and the deviations were concordant—every one of them ran in the direction of refined vegetable oil. Under the Study's own criteria, a deviation on a single marker of up to 10% beyond a Codex limit would have been tolerated as consistent, and as many as two marginal deviations without concordant deviations elsewhere would have been treated as merely "borderline." Study § 2.4, at 3. The Products were nowhere near either threshold.

57. The contrast with chips actually fried in avocado oil is stark. The researchers fried potato slices and corn tortilla pieces in pure retail avocado oil in the laboratory, re-extracted the oil from the finished chips, and measured it. The recovered oil still contained 19.5% palmitic acid, 7.0–7.1% palmitoleic acid, 1.0% stearic acid, 12.0–12.7% linoleic acid, 77.7–77.8% β-sitosterol, and 4.1% cis-vaccenic acid. Study, Table 2, at 7; *id.* Table S5. The oil recovered from Siete's chips contained 8.5–9.4% palmitic acid, 0.6–1.5% palmitoleic acid, 2.5–3.1% stearic acid, 10.6–31.8% linoleic acid, 63.6–66.2% β-sitosterol, and 1.2–1.9% cis-vaccenic acid. *Id.* Tables S3–S4. Chips fried in avocado oil do not look like Siete's chips.

58. The pattern the researchers observed in the failing samples is the chemical signature of substitution or dilution with vegetable oils. "Low levels of palmitic acid (C16:0) and palmitoleic acid (C16:1), together with elevated stearic acid (C18:0), are not characteristic of authentic avocado oil. Rather, this pattern is more consistent with substitution or dilution using vegetable oils." Study § 3.2, at 4. "Most avocado oil chips … fell outside the Codex standard ranges for C16:0, C16:1 and C18:0." *Id.* Every lot of every Product exhibited precisely that pattern. *Id.* Table

S3 (Sample Nos. 13–16). The same was true of the sterol markers: "[m]ost samples had campesterol, stigmasterol and Δ7-avenasterol levels outside the Codex standard ranges," and "[e]levated campesterol, stigmasterol and Δ7-avenasterol are consistent with substitution or dilution with vegetable oils." *Id.* § 3.2, at 4. Again, every lot of every Product exhibited precisely that pattern. *Id.* Table S4 (Sample Nos. 13–16).

59. Cis-vaccenic acid, C18:1 (n-7), is the single most discriminating marker for avocado oil authenticity, because it is characteristically elevated in avocado oil relative to common vegetable oils. Study § 3.3.2, at 7. In the Study, samples classified as consistent had cis-vaccenic acid values "clustering around 4-6%," while inconsistent samples "showed substantially lower levels, between 1-2%, aligning with typical vegetable oil profiles." *Id.*; *id.* Fig. 5, at 7. The mean was "5.3 ± 1.0% in consistent samples compared with 1.7 ± 0.5% in inconsistent samples ($p < 0.001$)." *Id.* § 3.3.2, at 7. The four Siete samples measured 1.9%, 1.9%, 1.2%, and 1.2%. *Id.* Table S3 (Sample Nos. 13–16). Every one falls inside the vegetable oil band the researchers identified, and every one is less than half the mean for samples consistent with authentic avocado oil.

60. Principal component analysis of the fatty acid and sterol data "demonstrated clear separation between samples classified as consistent and inconsistent with their labeled oil claims." Study § 3.3.1, at 4; *id.* Figs. 3–4, at 6. Many avocado oil–labeled samples clustered near vegetable-oil comparator samples containing canola, corn, soybean, and/or sunflower oil, "suggesting that the fatty acid profiles of those products are more consistent with polyunsaturated vegetable oil compositions than with authentic avocado oil." *Id.* § 3.3.1, at 6.

61. The Products' failure was part of a category-wide pattern. Of the 28 avocado oil–labeled chip samples tested, 26 (93%) were inconsistent. Study, Table 1, at 4; *id.* § 3.1, at 3. Of the 14 avocado oil–labeled chip products tested, not one was consistent in both lots: even the two

products with a single passing lot had a second lot that failed. *Id.* § 3.1, at 3. By contrast, when the same tests were applied to olive oil–labeled processed foods, only one of twenty failed—demonstrating that the failures are not an artifact of the method. *Id.*; *id.* Table 1, at 4; UC Davis News Release.

62. In short, the oil in the Products is not avocado oil, or at a minimum is not only avocado oil. It bears the compositional signature of the cheap refined vegetable oils that avocado oil is supposed to replace. Study, Tables S3–S4 (Sample Nos. 13–16); *id.* § 3.2, at 4.

**E. Frying Does Not Explain the Compositional Inconsistency**

63. The UC Davis researchers anticipated the defense that these deviations might be an artifact of cooking rather than evidence of what oil went into the product, and they refuted it experimentally. Study § 2.5, at 3; *id.* § 3.4, at 7–8.

64. The researchers prepared model products in the laboratory using two retail avocado oils as reference oils, whose pre-frying fatty acid and sterol profiles fell within every applicable Codex range. They fried blanched potato slices in pure avocado oil at 180°C for seven minutes, and white corn tortilla pieces in pure avocado oil at 180°C for four minutes, then re-extracted and analyzed the recovered oil. Study § 2.5.1, at 3; *id.* Table 2, at 7; *id.* Table S5.

65. The results were unambiguous. "For avocado oil subjected to frying …, absolute changes in major fatty acids were less than 0.6%." Study § 3.4, at 7. Cis-vaccenic acid "decreased by only 0.1% following frying in both potato and tortilla chips." *Id.* The three fatty acids that most sharply differentiated consistent from inconsistent samples—C16:0, C16:1, and C18:0—"did not change more than 0.2%." *Id.* at 7–8. And Δ7-avenasterol, "a sterol for which many of the inconsistent avocado oil-labeled chips exceeded the Codex limit, remained unchanged during the frying process." *Id.* at 8; *id.* Table 2, at 7.

66. The researchers concluded that "[t]hese model product experiments indicate that typical frying and emulsification conditions do not substantially alter oil authenticity markers," and that "the minor changes observed in the model systems are insufficient to explain the significant compositional deviations detected in the inconsistent products." Study § 3.4, at 8.

67. The magnitude of the deviations found in the Products cannot be explained by frying, by other processing, or by natural varietal or geographic variation, each of which the Study accounted for. The Study classified samples against Codex ranges that are themselves "intended to encompass expected natural variability" in cultivar, geographic origin, maturity, and growing conditions, Study § 2.4, at 3, and then layered a further 10% tolerance on top of those ranges. *Id.* The deviations in the Products are explained by the fact that the Products are not made with avocado oil, or not made only with avocado oil.

68. The Study states its limitations candidly, and they do not diminish what it establishes here. The researchers note that products were purchased in California retail stores and online and therefore "may not fully represent national market variability," and that "results reflect only the two specific lots analyzed and are not intended to represent ongoing manufacturing practices or lot-to-lot variability." Study § 3.4, at 8; *see also* UC Davis Media Kit ("Consistent results across multiple lots provide greater confidence in ingredient authenticity than results based on a single lot."). Here the results were consistent across multiple lots: two independent production lots of each Product were tested, and all four samples failed. Study, Tables S3–S4 (Sample Nos. 13–16). The Products are formulated, manufactured, and labeled uniformly for national distribution, and Defendant does not label the Products differently in Florida than in California. And where the researchers did observe lot-to-lot variability, it ran between a passing lot and a failing lot of the same product, *id.* § 3.1, at 3, which is itself evidence that Defendant does not

control the authenticity of the oil it buys. Plaintiff further alleges, on information and belief and subject to discovery of Defendant's sourcing, purchasing, supplier-qualification, and quality-control records, that the oil used in the Products throughout the class period was not authentic avocado oil, or was not exclusively authentic avocado oil.

**F. Defendant Knew or Should Have Known the Avocado Oil Representation Was False**

69. Defendant knew, or in the exercise of reasonable care could and should have known, that the Avocado Oil Representation was false and was misleading consumers.

70. Adulteration of avocado oil has been publicly and repeatedly documented for years. In 2020, UC Davis researchers published the first report on the quality and purity of avocado oil sold in the United States and found that 82% of the samples tested were rancid or mixed with other oils. Hilary S. Green & Selina C. Wang, *First report on quality and purity evaluations of avocado oil sold in the US*, 116 *Food Control* 107328 (2020); UC Davis News Release. A follow-up study published in 2023 found that approximately 70% of private-label avocado oils tested were rancid or mixed with other oils. Hilary S. Green & Selina C. Wang, *Purity and quality of private labelled avocado oil*, 152 *Food Control* 109837 (2023); UC Davis News Release. Both studies were widely reported in the trade and consumer press. And as the UC Davis Study itself recites, "[n]umerous studies have demonstrated that products marketed as avocado oil may be partially or wholly substituted with lower-cost vegetable oils or refined oils, resulting in mislabeling and economic adulteration." Study § 1, at 1.

71. In 2022, one of the same researchers published work identifying cis-vaccenic acid as a marker specifically useful for detecting seed oil adulteration in avocado oil. Hilary S. Green & Selina C. Wang, *Cis-vaccenic acid: New maker* [sic] *to detect seed oil adulteration in avocado oil*, 1 *Food Chemistry Advances* 100107 (2022); *see* Study § 3.3.2, at 7. Reliable, published,

inexpensive analytical methods for verifying avocado oil authenticity have thus been available to any manufacturer that wished to use them. Study § 1, at 1 (collecting ten published methods for assessing oil authenticity based on "fatty acid composition, sterol profiles, and other minor components").

72. Defendant is a sophisticated food manufacturer—since January 2025, a subsidiary of one of the largest food and beverage companies in the world. It sources the oil used in the Products, formulates the Products, and designs the Products' labels and advertising. It is aware, or should be aware, of industry studies and trends in its own core ingredient, and of the well-documented problem of adulteration in the avocado oil supply chain. It holds itself out to consumers as "thoughtful" about the ingredients it selects, and it built its brand on the very ingredient claim at issue. Third-party verification and certification programs addressed to exactly this risk exist and are available to manufacturers; the Study identifies the Seed Oil Free Alliance as one. Study § 3.1, at 4. Neither Product carried any such certification at the time the researchers purchased it. *Id.*

73. Defendant either knew that the oil it was buying and frying with was not authentic avocado oil, or it recklessly refrained from testing the oil upon which it built its brand. As the UC Davis researchers explained in the reporting accompanying the Study, without rigorous testing food companies may never detect adulterated oil, and food companies could do more to monitor and verify the authenticity of the oil they purchase. UC Davis News Release. Either way, Defendant, not the consumer, is the party in a position to know and to verify; Defendant is the party that made the affirmative representation; and Defendant is the party that collected the premium.

74. Defendant has continued to make the Avocado Oil Representation on the Products since publication of the UC Davis Study on July 11, 2026, and continues to make it today. Study at 1 (“Available online 11 July 2026”).

**G. The Products Are Misbranded and Adulterated Under Florida and Federal Law**

75. Under the Florida Food Safety Act, food is deemed adulterated “[i]f any substance has been substituted wholly or in part” for a declared ingredient, and “[i]f any valuable constituent has been in whole or in part omitted or abstracted therefrom.” Fla. Stat. § 500.10. The Products are adulterated within the meaning of that section: a cheaper vegetable oil has been substituted, wholly or in part, for the avocado oil the labels declare.

76. Food is deemed misbranded under Florida law “[i]f its labeling is false or misleading in any particular,” and unless its label bears the common or usual name of each ingredient. Fla. Stat. § 500.11(1). The Products are misbranded: their labeling is false in the particular that matters most to purchasers, and their ingredient statements fail to identify the oils actually present by their common or usual names.

77. It is unlawful in Florida to manufacture, sell, deliver, hold, or offer for sale any food that is adulterated or misbranded; to adulterate or misbrand any food; or to disseminate any false advertisement of a food. Fla. Stat. § 500.04(1), (2), (5). An advertisement of a food “is deemed to be false if it is false or misleading in any particular.” Fla. Stat. § 500.115.

78. Federal law is to the same effect, in materially identical terms. A food is misbranded if “its labeling is false or misleading in any particular,” 21 U.S.C. § 343(a)(1)—the federal analogue of Fla. Stat. § 500.11(1). A food is adulterated if “any valuable constituent has been in whole or in part omitted or abstracted therefrom” or if “any substance has been substituted wholly or in part therefor,” 21 U.S.C. § 342(b)(1)–(2)—the federal analogue of Fla. Stat. § 500.10. A food

is misbranded unless its label bears "the common or usual name of each … ingredient," 21 U.S.C. § 343(i)(2)—the federal analogue of Fla. Stat. § 500.11(1)(i). And FDA regulations require that ingredients "shall be listed by common or usual name in descending order of predominance by weight," 21 C.F.R. § 101.4(a)(1), and that "[t]he name of an ingredient shall be a specific name and not a collective (generic) name," 21 C.F.R. § 101.4(b)(1).

79. The state-law duties Plaintiff seeks to enforce are identical to the requirements federal law imposes, and Plaintiff seeks to impose no requirement that is different from, or additional to, any federal requirement. Plaintiff asks only that Defendant tell the truth about which oil is in the Products—precisely what 21 U.S.C. §§ 342(b) and 343(a)(1) and Fla. Stat. §§ 500.10 and 500.11(1) each independently require. Plaintiff does not ask this Court to require any different label format, type size, or typography; any different placement, prominence, or juxtaposition of any statement; any different image, graphic, or vignette; or any disclosure, warning, or qualifier that federal law does not already require. Plaintiff's claims are therefore not preempted, expressly or otherwise, by 21 U.S.C. § 343-1(a) or by any other provision of federal law.

80. Plaintiff's theory does not depend on the manner in which any true statement is presented. Plaintiff does not allege that an accurate statement on the Products' labels has been rendered misleading by its size, its position on the package, its relative prominence, or its proximity to some other statement, and does not allege that the labels mislead by reason of any image or vignette. Plaintiff alleges that the central factual assertion on each label is false: the Products are represented to be made with avocado oil, and the oil in them is not avocado oil. Nothing in federal law authorizes that misstatement, and no relief Plaintiff seeks would require Defendant's labels to depart in any respect from what federal law permits a truthful label to say.

81. Nothing in federal or Florida law requires or specifically permits a manufacturer to declare "avocado oil" on a food whose oil is not avocado oil. The opposite is true: the conduct alleged here is prohibited by both. No federal or Florida statute, regulation, standard of identity, guidance document, or agency determination authorizes the sale of a food whose declared oil is not the oil the food contains. On information and belief, Defendant submitted the Products' labels to no federal or state agency for pre-approval, and no agency reviewed or approved them. Because Plaintiff's claims are not preempted, and because the conduct alleged is affirmatively prohibited rather than required or specifically permitted by any law, the safe harbor of Fla. Stat. § 501.212(1) has no application to this action.

82. Plaintiff does not seek to enforce the Federal Food, Drug, and Cosmetic Act, and asserts no claim under it. Plaintiff cites the federal labeling provisions only as evidence of the standard of conduct and of the deceptiveness of Defendant's labeling, and pleads Chapter 500 of the Florida Statutes as a predicate "law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices" within the meaning of Fla. Stat. § 501.203(3)(c).

83. This action presents no unresolved question of federal food-labeling law, and no question committed in the first instance to the special competence of the Food and Drug Administration. "Avocado oil" is the common and usual name of the oil pressed from avocados. No federal statute, regulation, guidance document, or draft guidance questions whether that term is the appropriate name for that ingredient, and on information and belief the Food and Drug Administration has no pending rulemaking, guidance, request for comment, or other proceeding addressed to the naming of avocado oil or to the authenticity of avocado oil used as an ingredient in processed foods. The dispositive question in this case is not what a label may lawfully say. It is

a question of fact, what oil the Products actually contain, and it is answered by laboratory measurement of the recovered oil against published compositional standards, exactly as the UC Davis Study did. Plaintiff seeks no interpretation of any federal regulation, no determination that any term is or is not a common or usual name, and no relief that would conflict with, intrude upon, or require this Court to substitute its judgment for, the agency's administration of the federal labeling scheme.

**H. Plaintiff and the Class Were Injured**

84. Consumers purchased, and continue to purchase, the Products in substantial part because the Avocado Oil Representation conveys the unequivocal message that the Products are made with avocado oil.

85. Plaintiff and Class members would have paid less for the Products, or would not have purchased them at all, absent the Avocado Oil Representation. They therefore suffered financial injury in the form of the price premium the Products commanded in the market as a result of a representation that was false.

86. In the alternative, because the Products are adulterated and misbranded and therefore may not lawfully be sold in Florida, Plaintiff and Class members received a product that they could not lawfully have been sold and that had no value to them as the product they bargained for, entitling them to a full refund of the purchase price.

87. Plaintiff's and Class members' damages are capable of measurement on a classwide basis through standard economic methodologies, including conjoint analysis and hedonic regression, applied to the price premium attributable to the Avocado Oil Representation.

## CLASS ACTION ALLEGATIONS

88. Plaintiff brings this action individually and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of the following classes:

(a) **Nationwide Class:** All persons in the United States who purchased the Products for personal, family, or household use, and not for resale, during the applicable statute of limitations period through the date of class certification.

(b) **Florida Subclass:** All persons who purchased the Products in the State of Florida for personal, family, or household use, and not for resale, during the applicable statute of limitations period through the date of class certification.

89. The Nationwide Class and the Florida Subclass are referred to collectively as the "Classes." Unless otherwise indicated, allegations concerning the Nationwide Class apply equally to the Florida Subclass. Count I is asserted on behalf of the Florida Subclass. Count II is asserted on behalf of the Nationwide Class and, in the alternative, on behalf of the Florida Subclass.

90. Excluded from the Classes are: Defendant and its parents, subsidiaries, affiliates, officers, directors, and current or former employees, and any entity in which Defendant has a controlling interest; the legal representatives, heirs, successors, and assigns of any excluded person or entity; all persons who make a timely election to be excluded; the judge to whom this case is assigned, that judge's staff, and their immediate family members; and all persons asserting claims for personal injury.

91. Pursuant to Rule 23(c)(1)(C), the foregoing class definitions are placeholders that may be altered or amended at any time before final judgment. Plaintiff reserves the right to modify, narrow, or expand the class definitions, and to propose issue classes under Rule 23(c)(4) or subclasses under Rule 23(c)(5), based on information obtained in discovery.

92. **Numerosity — Rule 23(a)(1).** The Classes are so numerous that joinder of all members is impracticable. The Products are sold throughout the United States and throughout Florida at national and regional retailers and online. On information and belief, the number of persons who purchased the Products during the class period is in the hundreds of thousands, and the Florida Subclass alone numbers in the tens of thousands. While the precise number and identities of Class members are presently unknown to Plaintiff, they are ascertainable from Defendant's records, retailer and distributor records, loyalty-program and e-commerce data, and self-identification by affidavit.

93. **Commonality and Predominance — Rules 23(a)(2) and 23(b)(3).** There are questions of law and fact common to the Classes that predominate over any questions affecting only individual members. These common questions include:

(a) whether the Products bear the Avocado Oil Representation;

(b) whether the oil used to make the Products is authentic avocado oil;

(c) whether the oil used to make the Products is substituted or diluted with other, cheaper oils;

(d) whether the Avocado Oil Representation is false or misleading to a reasonable consumer;

(e) whether Defendant failed to disclose that the Products contain oils other than avocado oil;

(f) whether the Products are adulterated or misbranded under Fla. Stat. §§ 500.04, 500.10, and 500.11;

(g) whether Defendant's conduct constitutes an unfair or deceptive act or practice under FDUTPA;

(h) whether Defendant knew or should have known the Avocado Oil Representation was false;

(i) whether the Products commanded a price premium as a result of the Avocado Oil Representation, and if so in what amount;

(j) whether Defendant was unjustly enriched;

(k) whether Plaintiff and the Classes are entitled to damages, restitution, and/or injunctive relief, and in what amount or form; and

(l) whether Plaintiff and the Classes are entitled to an award of attorney's fees, costs, and pre- and post-judgment interest.

94. These questions are answerable with evidence common to the Classes. The Avocado Oil Representation appears uniformly on every package of each Product. The composition of the oil in the Products is a single scientific question susceptible of common proof. Whether the Representation is likely to deceive a reasonable consumer is judged by an objective standard, and FDUTPA does not require proof of individualized reliance.

95. **Typicality — Rule 23(a)(3).** Plaintiff's claims are typical of the claims of the Classes. Plaintiff and every Class member purchased the same Products, bearing the same uniform Avocado Oil Representation, and were injured in the same way—by paying a price premium for a product that was not what its label said it was. Plaintiff's claims arise from the same course of conduct and are based on the same legal theories as those of the Classes.

96. **Adequacy — Rule 23(a)(4).** Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has no interests antagonistic to or in conflict with those of the Classes. Plaintiff has retained counsel competent and experienced in consumer class action and complex litigation, and counsel intend to prosecute this action vigorously.

97. **Superiority — Rule 23(b)(3).** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by each individual Class member are small relative to the expense and burden of individual litigation, so it would be virtually impossible for Class members to obtain effective redress individually. Even if they could, individualized litigation would multiply expense and delay for all parties and for the judicial system, and would create the risk of inconsistent or contradictory adjudications. Concentrating the litigation of these claims in a single forum will conserve party and judicial resources and promote consistency. Plaintiff is aware of no difficulty likely to be encountered in the management of this action as a class action.

98. **Rule 23(b)(2).** Defendant has acted and refused to act on grounds generally applicable to the Classes—namely, by uniformly labeling and advertising the Products with the Avocado Oil Representation—thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the Classes as a whole.

99. **Ascertainability.** The Classes are readily ascertainable by objective criteria: purchase of an identified Product within a defined period and geography. Class membership may be established through Defendant's and retailers' sales records, loyalty-program and e-commerce data, receipts, and, where necessary, claimant affidavits. Notice may be provided by direct mail, email, publication, digital media, and point-of-sale notice.

## CAUSES OF ACTION

### COUNT I
### Violation of the Florida Deceptive and Unfair Trade Practices Act
### Fla. Stat. §§ 501.201, et seq.
### (On Behalf of the Florida Subclass)

100. Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

101. Plaintiff brings this Count individually and on behalf of the Florida Subclass.

102. FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). In construing that provision, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act." Fla. Stat. § 501.204(2).

103. The statute is to be "construed liberally" to "protect the consuming public … from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

104. Plaintiff and the Florida Subclass are "consumers" within the meaning of Fla. Stat. § 501.203(7). Defendant's manufacture, marketing, labeling, advertising, distribution, and sale of the Products constitute "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

105. The elements of a FDUTPA damages claim are (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. Each is present here.

106. Defendant committed deceptive acts and unfair practices by representing on the front of every package of each Product, and in the ingredient statement on every package of each Product, that the Products are made with avocado oil and with no other oil, when in truth the oil in the Products is not compositionally consistent with authentic avocado oil and has been substituted or diluted with cheaper vegetable oils. Study, Tables S3–S4 (Sample Nos. 13–16); *id.* §§ 3.1–3.2, at 3–4. Defendant compounded the deception by failing to disclose the presence of other oils anywhere on the packaging or elsewhere.

107. A deceptive act under FDUTPA is one "likely to deceive a consumer acting reasonably in the same circumstances." That standard is objective and does not require proof that

any particular consumer relied on the representation. The Avocado Oil Representation is likely to deceive—indeed, was designed to persuade—a reasonable consumer, because it is an affirmative, specific, factual statement about the composition of the food, placed where consumers look, and repeated in the one place on the package where consumers expect a complete and truthful accounting of what they are eating.

108. Defendant's conduct is independently unfair. It offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, who bought food without being told what was in it and had no ability to discover the truth. The conduct caused substantial consumer injury that consumers could not reasonably have avoided and that is not outweighed by any countervailing benefit to consumers or competition.

109. Defendant's conduct is independently unlawful and constitutes a *per se* violation of FDUTPA under Fla. Stat. § 501.203(3)(c), because it violates the Florida Food Safety Act: Defendant manufactured, sold, delivered, held, and offered for sale food that is adulterated and misbranded, adulterated and misbranded food, and disseminated false advertisements of food, in violation of Fla. Stat. § 500.04(1), (2), and (5); the Products are adulterated under Fla. Stat. § 500.10; the Products are misbranded under Fla. Stat. § 500.11(1); and Defendant's advertising of the Products is false under Fla. Stat. § 500.115.

110. No provision of federal or Florida law requires or specifically permits the conduct alleged. To the contrary, that conduct is prohibited by Fla. Stat. § 500.04 and by 21 U.S.C. § 343(a)(1) and (i)(2). The exemption in Fla. Stat. § 501.212(1) therefore does not apply.

111. Plaintiff's *per se* theory rests on Florida statutory provisions that are identical to their federal counterparts, and it therefore imposes no requirement different from or additional to federal law. Fla. Stat. § 500.11(1) mirrors 21 U.S.C. § 343(a)(1); Fla. Stat. § 500.11(1)(i) mirrors

21 U.S.C. § 343(i)(2); and Fla. Stat. § 500.10 mirrors 21 U.S.C. § 342(b)(1)–(2). The federal adulteration standard is not within the express preemption provision of 21 U.S.C. § 343-1(a) at all, and the federal misbranding provision on which Plaintiff principally relies—21 U.S.C. § 343(a)(1)—is likewise absent from the categories that provision enumerates. To the extent any Florida requirement Plaintiff seeks to enforce is of a type enumerated in § 343-1(a), it is identical to the corresponding federal requirement and is expressly preserved.

112. Plaintiff's deception and unfairness theories are independent of the *per se* theory and do not depend on the violation of any federal law. A representation that a food is made with an oil the food does not contain is likely to deceive a consumer acting reasonably in the same circumstances whether or not any regulator has ever addressed the subject, and Plaintiff would be entitled to relief under Fla. Stat. § 501.204(1) on that basis alone.

113. Defendant's deceptive acts and unfair practices caused Plaintiff's and the Florida Subclass's injuries. The Avocado Oil Representation appeared uniformly on every unit of each Product sold in Florida. Consumers were exposed to it at the point of sale. But for the Representation, Plaintiff and the Florida Subclass would not have purchased the Products or would have paid substantially less for them.

114. Defendant's deceptive acts and practices are consumer-oriented and have a broad impact on consumers at large. They are not isolated to a single transaction; they are the product of a uniform, standardized labeling program applied to every package of each Product distributed in Florida.

115. Plaintiff and the Florida Subclass suffered actual damages. They paid a price premium for Products that were not what Defendant represented them to be, and they received Products worth less than what they paid and less than what they were promised. The measure of

actual damages is the difference between the market value of the Products as delivered and their market value as they should have been delivered—or, in the alternative, because adulterated and misbranded food may not lawfully be sold in Florida, the full purchase price.

116. Plaintiff and the Florida Subclass seek actual damages under Fla. Stat. § 501.211(2); declaratory relief and an injunction under Fla. Stat. § 501.211(1) barring Defendant from making the Avocado Oil Representation on the Products unless and until the oil in the Products conforms to the applicable compositional criteria for authentic avocado oil; and attorney's fees and costs under Fla. Stat. § 501.2105.

117. Plaintiff does not seek recovery for personal injury or for damage to property other than the Products themselves. See Fla. Stat. § 501.212(3).

**COUNT II**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class and, Alternatively, the Florida Subclass)**

118. Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

119. Plaintiff pleads this Count in the alternative to her statutory claim, as permitted by Fed. R. Civ. P. 8(d)(2)–(3), and to the extent any such claim is found not to provide an adequate remedy at law. Plaintiff and the Classes have no adequate remedy at law for the restitution and equitable relief sought in this Count.

120. A claim for unjust enrichment under Florida law has three elements: that the plaintiff conferred a benefit on the defendant; that the defendant voluntarily accepted and retained that benefit; and that the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying its value. Each element is present here.

121. Plaintiff and Class members conferred a benefit on Defendant by paying the purchase price of the Products. Defendant received the proceeds of those purchases, including the price premium attributable to the Avocado Oil Representation, whether a given purchase was made directly from Defendant's own direct-to-consumer website or from a retailer that acquired the Products from Defendant for resale to consumers.

122. Defendant voluntarily accepted and retained that benefit in the form of the revenues and profits it derived from the sale of the Products, and retains it still. Defendant had knowledge of the benefit conferred: it designed the Products' labels, set the Products' wholesale prices, and tracked the Products' sales.

123. Under the circumstances, it would be inequitable for Defendant to retain that benefit without paying its value, because the benefit was obtained through false representations about the composition of a food product, and because Plaintiff and Class members would not have conferred the benefit at all, or would have conferred substantially less of it, had they known the truth.

124. Plaintiff and the Classes seek restitution and disgorgement of the amounts by which Defendant was unjustly enriched, and the imposition of a constructive trust upon those amounts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Leah Jung, individually and on behalf of the proposed Classes, respectfully requests that the Court enter judgment against Defendant and award the following relief:

a. Certifying this action as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3); appointing Plaintiff as Class Representative; and appointing the undersigned as Class Counsel under Rule 23(g);

b. Declaring that Defendant's conduct as alleged herein violates the laws described herein;

c. Entering judgment in favor of Plaintiff and the Classes and against Defendant on all counts asserted herein;

d. Awarding Plaintiff and the Classes actual, compensatory, and consequential damages in an amount to be proven at trial;

e. Awarding Plaintiff and the Classes restitution, restitutionary disgorgement, and other equitable monetary relief, including the imposition of a constructive trust over the amounts by which Defendant was unjustly enriched;

f. Entering permanent injunctive relief under Fla. Stat. § 501.211(1) and Federal Rule of Civil Procedure 23(b)(2) prohibiting Defendant from making the Avocado Oil Representation on the Products unless and until the oil used in the Products is in fact avocado oil conforming to the applicable compositional criteria, and requiring Defendant to implement and disclose a supplier-verification and lot-testing program sufficient to substantiate the representation;

g. Entering a declaratory judgment that Defendant's acts and practices violate FDUTPA;

h. Awarding Plaintiff and the Classes their reasonable attorney's fees, expenses, and costs of suit, including pursuant to Fla. Stat. § 501.2105;

i. Awarding pre-judgment and post-judgment interest at the maximum rate allowed by law;

j. Awarding nominal damages; and

k. Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, individually and on behalf of the proposed Classes, hereby demands a trial by jury on all issues so triable.

Dated: August 20, 2026

Respectfully submitted,

/s/ Lawrence Cody____
Lawrence Cody, Esq.
Florida Bar No. 1068617
Alex Couch, Esq.
Florida Bar No. 118152
**NORMAND, JUDKINS, & COUCH, PLLC**
3165 McCrory Place, Suite 175
Orlando, Florida 32803
Telephone: (407) 603-6031
l.cody@njc.law
a.couch@njc.law
service@njc.law

Counsel for Plaintiff and the Proposed Classes